# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4850-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

E.G.T.,

     Defendant-Appellant.

_____

> Argued telephonically April 20, 2020 –
> Decided May 7, 2020
>
> Before Judges Sabatino and Geiger.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-09-1712.
>
> Michael J. Confusione, argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the brief).
>
> Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

PER CURIAM

Defendant E.G.T.,[1] appeals from his conviction for sexual assaulting his first cousin and sentence. We affirm.

I.

We take the following facts from the trial record. J.S. and defendant are first cousins. On August 10, 2014, J.S. traveled to New Jersey to attend another cousin's baby shower; J.S. resides in Baltimore with her husband. That weekend, defendant was staying at his father's home in a nearby town but did not attend the baby shower. Rather than drive back to Baltimore that evening, J.S. accepted her uncle's invitation to spend the night at his home.

After the baby shower, J.S. drove to her uncle's house where she met with her uncle and defendant. Her uncle showed her around his house, including the second-floor bedroom where she would be sleeping. Around 10:30 p.m., J.S. and defendant decided to walk to a nearby bar to "catch up" over drinks. There, they alternated in buying approximately five rounds of drinks. J.S. went to the restroom after finishing her fourth drink. When she arrived back at their table, J.S. noticed defendant had already purchased another round of drinks. J.S. noted

---

[1] We refer to defendant and the victim by initials to protect the victim's privacy. R. 1:38-3(c)(12).

A-4850-17T4

her drink tasted "different," describing it as "rail vodka." J.S. and defendant left the bar around 1:30 a.m.; each provided a different version of what transpired afterwards.

J.S. testified that prior to consuming the fifth drink she felt "tipsy" but "[n]ot completely drunk." However, her fifth drink "tasted a little bit different" and "off a little bit." After consuming it, J.S. does not remember how she got back to her uncle's home or getting undressed.

Her next recollection, through "tunnel vision," was laying naked in bed with defendant who "spat" on two of his fingers and "shoved them inside [her] vagina." J.S. attempted to stop defendant by "fl[inging] [her] left leg over him and crouch[ing] on [her] right side in a fetal position" and attempting to say "no," but was unable to because her "body was so weak." She "remember[ed] feeling a tug on [her] hip as if [defendant] was trying to pull [her] back onto [her] back and [she] passed out again." J.S. regained consciousness a second time as defendant "was masturbating himself, and again he took his two fingers and spit on them and shoved them inside of [her] and at that point [she] did say no and [she] rolled over the same way [she] did the first time."

J.S. testified she "was feeling much more conscious, much more alert than the first time," but she felt "groggy, still heavy, still feeling kind of weak." At

3

this point, she "covered [herself] up with the covers." In response, defendant got dressed and left the room, asking J.S. if she wanted coffee. After a moment of silence, J.S. responded "Yes, if you're making some." While defendant showered, J.S. got dressed but could not locate her shirt. When defendant was in the kitchen, J.S. asked from the bedroom if he knew where her shirt was; defendant went upstairs and found J.S.'s shirt behind a pillow. J.S. then went downstairs and had coffee while defendant was getting ready for work. Defendant left for work about ten minutes later. Shortly thereafter, J.S. drove back to Baltimore.

J.S. testified she felt "differently" when compared to previous occasions that she consumed similar amounts of alcohol, describing it as a "heavy grogginess that was just unlike anything [she] had felt before." J.S. stated that what she felt was "not the same" as a typical hangover.

J.S. further testified:

> I knew that I did not consent to sex. I never actually saw him penetrate me with his penis. I knew that this was my cousin, my blood relative, my family, and I couldn't believe what just happened. I was in shock, traumatized, disgusted, and just I thought that, you know, I was just going to go have some drinks with somebody that I should have been able to trust.

A-4850-17T4

The next morning, J.S. told her friend that defendant had raped her. That same day, J.S. and her friend went to the Greater Baltimore Medical Center, where a Sexual Assault Forensics Examination (SAFE) was performed on J.S. Samples taken during the SAFE exam were compared to DNA profiles developed from known samples from J.S., her husband, and defendant. The State's forensic scientist opined that defendant was the major contributor for the sperm located on J.S.'s vaginal swab.

Defendant's version is much different. Defendant testified he and J.S. walked to a bar where they had five or more rounds of alcoholic drinks. The then walked to a pizzeria at 1:30 a.m. to get food before walking back to his father's house. Defendant stated he and J.S. "were fine" but "both pretty drunk." Defendant went upstairs where he went to the bathroom, got changed, and went to bed. Thereafter, J.S. entered his room and "started kissing [him]." Though shocked and "very surprised," defendant stated they engaged in consensual sexual intercourse after removing each other's clothing, and then fell asleep together.

Defendant further testified he woke up the next morning at around 8:00 a.m. to go to work; he took a shower and went downstairs to the kitchen for coffee. Thereafter, J.S. went downstairs wearing her pants and a bra, and told

defendant she could not find her shirt. They went upstairs together to look for J.S.'s shirt, which defendant found under the pillow where they slept. Defendant then made J.S. a cup of coffee and they had a brief conversation in the kitchen before defendant left for work.

In September 2015, a Monmouth County Grand Jury returned an indictment charging defendant with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(7) (count one); and second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count two).

Prior to trial, defendant moved in limine to exclude all testimony advancing the theory that defendant drugged J.S. Defendant argued such testimony is inappropriate because the State lacked physical evidence or expert testimony that J.S. was drugged, and J.S.'s own lay testimony that she was drugged, or that she took a substance that altered her state of mind, was not admissible. Conversely, the State argued such testimony was appropriate because J.S. "is allowed to testify to her perceptions, to her observations, to how she's feeling."

The trial court granted the motion in part. It barred any testimony asserting that J.S. "had been drugged." The court allowed J.S. to testify

6

regarding her mental and physical condition as well as her observations and perceptions. The court explained:

> Under N.J.S.A. 2C:14-2(a)(7), the State must prove [d]efendant knew or should have known that J.S. "was physically helpless or incapacitated."
>
> As a lay witness, J.S. may testify to her mental and physical condition as well as her observations and perceptions on the morning of the incident. J.S. testifying about her own mental and physical condition is certainly within her rational perception. Similarly, J.S.'s testimony is helpful to determining a fact in issue, specifically whether or not J.S. was physically helpless or incapacitated.
>
> J.S., however, is not an expert witness. The State must not elicit testimony from J.S. that she "had been drugged." Such an opinion is scientific and falls within the realm of expert testimony. What J.S. perceived through one or more of her senses, however, is clearly admissible lay witness testimony.

The court also precluded the State from introducing testimony from the SAFE nurse regarding testing for the presence of specific drugs as part of standard toxicological testing performed on the victim's blood and urine samples and the reasons why those tests were not performed.

During a pretrial conference held the week before trial, the State raised the issue of whether Dr. Safferstein, who had authored a preliminary report on behalf of defendant, would be proffered as a defense toxicological expert. The

7

State noted Dr. Safferstein was not listed on defendant's witness list and it had not received his final expert report. Defense counsel advised the court that Dr. Safferstein was not being called as a witness.

The case proceeded to trial. In her opening, the prosecutor informed the jury that after J.S. returned from the bar bathroom, "defendant ha[d] brought a fifth round of drinks," and that "the drink tasted different; not horrible, just different." She then stated that J.S. lost consciousness soon after. Later in the trial, defendant did not object to J.S.'s testimony regarding her "self-described" altered state. After the State rested, defense counsel moved for a mistrial contending the State improperly elicited testimony from J.S., through leading questions, that she felt "heavy grogginess that was just unlike anything she had felt before" and "a line of questioning regarding the alcohol that she drank, her history of drinking alcohol, her history of being drunk, [and] her history of being under the influence of alcohol." The court denied the motion, finding it was "satisfied" the State had "scrupulously complied" with its prior ruling.

During the charge conference, defendant requested the court to warn the State to not discuss drugs during its closing argument. The court responded, "I think we're crystal clear on that."

A-4850-17T4

On March 29, 2017, the jury found defendant guilty of second-degree sexual assault but acquitted him of first-degree aggravated sexual assault.

Defendant was evaluated at the Adult Diagnostic and Treatment Center to determine eligibility for sentencing under the purview of the New Jersey Sex Offender Act, N.J.S.A. 2C:47-1 to -10. The report by psychologist Mark Frank, Ph.D., noted that defendant had "no known prior arrests or convictions for sex offenses." Defendant's score on the Static-99R[2] instrument placed him in the average risk category for sexual reoffending. Dr. Frank concluded there was no evidence "that the present offense forms a part of a repetitive pattern of criminal sexual behavior." See N.J.S.A. 2C:47-2. He found "no indication of sexual compulsion." See ibid. Accordingly, defendant was determined to be ineligible for sentencing under the Sex Offender Act.

Defendant, who was thirty-six years old at the time of sentencing, had no juvenile record or prior indictable convictions. In 2003, defendant was charged

---

[2] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Civil Commitment of A.Y., 458 N.J. Super. 147, 158 n.1 (App. Div. 2019) (quoting In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014)). The Static-99R is "based upon static factors, which are elements of a person's history which cannot be changed, as opposed to dynamic factors, which are elements which can be modified over time." In re J.P., 339 N.J. Super. 443, 451 (App. Div. 2001).

with simple assault of his father, N.J.S.A. 2C:12-1(a)(1). The charge was dismissed. A domestic violence restraining order entered against defendant arising out of the same incident was dismissed in 2010. In 2012, defendant was found guilty of violating a municipal ordinance for urinating in public.

Defendant appeared for sentencing on July 21, 2017. The trial court found aggravating factors three (risk defendant will reoffend) and nine (need for deterrence), N.J.S.A. 2C:44-1(a)(3), (9), and no mitigating factors. It declined to find mitigating factor seven (defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period), N.J.S.A. 2C:44-1(b)(7). The court found the aggravating factors "substantially outweighed" the non-existent mitigating factors.

Defendant was sentenced to a ten-year prison term subject to an eighty-five percent period of parole ineligibility and three years of mandatory parole supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, the reporting and registration requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23, parole supervision for life, N.J.S.A. 2C:43-6.4, and mandatory fines and penalties.

In finding aggravating factor three, the judge determined there was a clear risk defendant will commit another offense. The court noted defendant "is not

A-4850-17T4

accepting full blame for his part in this incident" and stated that "what happened was totally inappropriate." In find aggravating factor nine, the judge explained there was a clear need to deter both defendant and others from this unacceptable behavior. The court noted it is unacceptable to blame the victim.

In declining to find mitigating factor seven, the court explained that because of defendant's prior "involvement with the criminal justice system," it could not find "defendant has no history of prior delinquency [or] criminal activity, or has led a law abiding life for a substantial period of time." This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN NOT GRANTING IN FULL DEFENDANT'S MOTION TO PRECLUDE THE PROSECUTION FROM ELICITING TESTIMONY AND ARGUMENT BEFORE THE JURY SUGGESTING THAT J.S. MUST HAVE BEEN DRUGGED BY DEFENDANT ON THE NIGHT IN QUESTION, AND IN NOT GRANTING A MISTRIAL AFTER THE PROSECUTION PLACED THE FORBIDDEN EVIDENCE AND ARGUMENT BEFORE THE JURY.

POINT II

THE TRIAL COURT ERRED IN NOT PERMITTING DEFENDANT TO OFFER AT TRIAL THEIR OWN SCIENTIFIC EVIDENCE AND EXPERT

11

TESTIMONY SHOWING THAT J.S. DID NOT HAVE ANY DRUGS IN HER SYSTEM AT THE TIME IN QUESTION (PLAIN ERROR; RAISED BUT NOT OBJECTED TO BELOW).

POINT III

THE PROSECUTOR EXCEEDED FAIR COMMENT ON THE EVIDENCE BY TELLING THE JURY DURING SUMMATION THAT DEFENSE COUNSEL WAS INVOKING ONLY "MYTHS," "STEREOTYPES," AND "CLICHÉS" IN ATTACKING THE RAPE VICTIM'S CREDIBILITY (PLAIN ERROR).

POINT IV

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

We have considered these arguments and find they lack merit.

## II.

Defendant argues the trial court erred in not granting his motion in limine in its entirety. Specifically, defendant argues the testimony elicited from J.S., coupled with the State's comments, prejudiced him by allowing the State to invite the jury to speculate that J.S.'s fifth drink was drugged. For that same reason, defendant contends the court erred in denying his motion for a mistrial.

## A.

We first address the partial denial of defendant's motion in limine. "Traditional rules of appellate review require substantial deference to a trial

court's evidentiary rulings." State v. Morton, 155 N.J. 383, 453 (1998). We uphold the trial court's rulings "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997) (internal quotation marks omitted)). If an abuse of discretion is found, "we must then determine whether any error found is harmless or requires reversal." State v. Prall, 231 N.J. 567, 581 (2018).

Defendant moved to bar the State from eliciting testimony that suggested J.S. was drugged by defendant. The court disallowed such evidence by the State but permitted J.S. to give lay testimony about her perceptions during the incident.

Lay witness testimony is governed by N.J.R.E. 701, which provides that a lay "witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." To be admissible, "[t]he witness's perception must 'rest[] on the acquisition of

13

knowledge through use of one's sense of touch, taste, sight, smell or hearing.'" State v. Hyman, 451 N.J. Super. 429, 442 (App. Div. 2017) (second alteration in original) (quoting State v. McLean, 205 N.J. 438, 457 (2011)).

The trial court properly barred the State from eliciting lay opinion testimony from J.S. that she was drugged without tests indicating the presence of an illicit substance, State v. Bealor, 187 N.J. 574, 590-92 (2006), while permitting her to testify—as a lay witness—on her own rationally based perceptions, N.J.R.E. 701(a). As the court also reasoned, such testimony "is helpful in determining a fact in issue, specifically whether or not J.S. was physically helpless or incapacitated."[3] N.J.R.E. 701(b). The testimony was relevant to J.S.'s vulnerability and state of mind and was limited to her own perceptions as permitted under N.J.R.E. 701(a). It was also relevant to whether the sexual intercourse was consensual and her ability to accurately recollect the incident. N.J.R.E. 701(b). The testimony was not unduly prejudicial under N.J.R.E. 403. We discern no abuse of discretion in allowing such testimony.

---

[3] "An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration" on the victim where "the actor knew or should have known" the victim was "incapable of providing consent" because she was "physically helpless or incapacitated," or "mentally incapacitated." N.J.S.A. 2C:14-2(a)(7).

B.

We next address the denial of defendant's motion for a mistrial. Defendant contends the prosecutor improperly elicited testimony from J.S. suggesting she was drugged by defendant and improperly commented on J.S.'s state of consciousness during her opening argument. Defendant contends the testimony and these comments planted the suggestion that J.S. was drugged. We disagree.

"The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, which should grant a mistrial only to prevent an obvious failure of justice." State v. Montgomery, 427 N.J. Super. 403, 406-07 (App. Div. 2012) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). In making this determination, we give deference to the trial court, "which is in the best position to gauge the effect of the allegedly prejudicial evidence." Montgomery, 427 N.J. Super. at 407 (quoting Harvey, 151 N.J. at 205).

Here, the court ruled "[t]he State must not elicit testimony from J.S. that she 'had been drugged.'" The State did not do so. It properly limited its questions to J.S.'s perceptions regarding her level of intoxication; ability to speak or move; and whether she was awake, asleep, or unconscious. This examination of the victim fell squarely within the questioning permitted by the

15

court and avoided any impermissible lay testimony that J.S. had been drugged. Notably, defense counsel did not object to J.S.'s testimony concerning her altered state. We discern no abuse of discretion by the trial court, much less a manifest injustice.

III.

We next address defendant's argument that the trial court erred by precluding him from introducing scientific evidence and expert testimony that J.S. did not have any drugs in her system during the incident. Specifically, defendant argues he "should have been permitted to introduce the lab report and expert opinion to argue that no such 'date rape' drugs were found in J.S.'s system." We find no merit in this argument.

Defendant did not name his toxicology expert, Dr. Safferstein, on his witness list. He apparently did not serve the State with Dr. Safferstein's final report. Further, during a pretrial conference held the week before trial, defense counsel reported to the court that Dr. Safferstein was not being called as a witness.

Contrary to defendant's argument, the trial court did not preclude defense counsel from introducing Dr. Safferstein's report or testimony. Instead, it appears the defense made a strategic choice not to list or call his toxicology

expert as a trial witness, electing not to use such evidence. Accordingly, we discern no error.

## IV.

Defendant argues for the first time on appeal that the prosecutor's comments during her closing, combined with testimony suggesting he "drugged" J.S., "raise reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." We disagree.

During summation, defense counsel advanced the theory that defendant and J.S. engaged in consensual sexual intercourse and that J.S. manufactured the rape allegation to "coverup" the fact she "had unprotected sex with [her] first cousin and [she] cheated on [her] husband." Defense counsel supported this theory by asserting J.S.'s actions were not indicative of someone who was raped. He argued, for example, that "common sense tells us, that if someone's raped they don't have coffee with the person who raped them[,] . . . they don't invite the rapist back into the bedroom, in just a bra, to help them find their shirt[,] . . . [and] they don't act normal all morning long."

In response, the prosecutor described defense counsel's comments as "myths," "stereotypes," and "clichés" regarding how a victim of sexual assault

A-4850-17T4

is expected to react.  Defense counsel did not object or request that the court provide a curative instruction.

Although a prosecutor is "afforded considerable leeway" during summation, they "must refrain from improper methods that result in a wrongful conviction."  State v. Smith, 167 N.J. 158, 177 (2001) (citing State v.Frost, 158 N.J.76, 82-83(1999) (other citations omitted)).  Thus, "'not every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal."  State v. Jackson, 211 N.J. 394, 408-09 (2012) (quoting State v. Williams, 113 N.J. 393, 452 (1988)).

A reviewing court evaluates challenged remarks in the context of the summation as a whole.  State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)).  Reversal is warranted only if the remarks were "clearly and unmistakably improper" and "substantially prejudiced the defendant's fundamental right to have a jury fairly evaluate the merits of his or her defense."  State v. Ingram, 196 N.J. 23, 43 (2008) (quoting State v. Harris, 181 N.J. 391, 495 (2004)).  To warrant such a severe remedy, an appellate court must be convinced the error was "clearly capable of producing an unjust result."  State v. R.B., 183 N.J. 308, 330 (2005) (quoting R. 2:10-2).  "The possibility must be real, one sufficient to raise a reasonable doubt as to

whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).

Here, the prosecutor's remarks did not exceed the bounds of fair comment regarding the evidence and the victim's credibility. The remarks appropriately responded to defense counsel's repeated notion that victims of sexual assault should act a certain way. See State v. C.H., 264 N.J. Super. 112, 135 (1993) ("Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless." (citing State v. DiPaglia, 64 N.J. 288, 297 (1974)). Further, defense counsel did not object, request a curative instruction, or otherwise seek to remedy the purported prejudice resulting from the State's comments until this appeal. See Frost, 158 N.J. at 83-84 (generally, if defense counsel does not object to the prosecutor's remarks, such "remarks will not be deemed prejudicial" as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made" (citation omitted)).

Viewed in the context of the entire summation, the comments were not clearly and unmistakably improper and did not substantially prejudice defendant's right to have the jury fairly evaluate the merits of his defense. Indeed, defendant was found not guilty of aggravated sexual assault. The

19

prosecutor's closing argument clearly did not cause the jury to conclude that J.S. had been drugged and thereby rendered "helpless," "incapacitated," or otherwise "incapable of providing consent." See N.J.S.A. 2C:14-2(a)(7).

V.

Finally, we address defendant's argument that his sentence was improper and excessive. Defendant was sentenced to a ten-year prison term, the maximum for second-degree sexual assault. N.J.S.A. 2C:43-6(a)(2).

The court found aggravating factors three and nine. In addition to reviewing defendant's prior record, it noted defendant did not accept blame for his conduct or the fact that "what happened was totally inappropriate." The court found there is need to deter defendant, "who at this point still doesn't acknowledge his role in this offense," and others, who "need to know that this behavior is not acceptable."

Defendant argues the court did not sufficiently explain its finding of aggravating factors three and nine as well as its rejection of mitigating factor seven. He then contends that even if those aggravating factors are supported by the record, they should be given minimal weight and do not substantially outweigh mitigating factor seven.

"[Our] review of sentencing decisions is relatively narrow and is governed

by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We do not substitute our judgment for that of the trial court. State v. Natale, 184 N.J. 458, 489 (2005). A sentence should only be disturbed when the trial court failed to follow sentencing guidelines, when the aggravating and mitigating factors are not supported by the evidence, or when the facts and law show "such a clear error of judgment that it shocks the judicial conscience." State v. Roth, 95 N.J. 334, 364 (1984) (citing State v. Whitaker, 79 N.J. 503, 512 (1979)); accord State v. Case, 220 N.J. 49, 65 (2014).

In weighing the aggravating and mitigating factors, the court must conduct a qualitative—not quantitative—analysis and provide a "clear explanation" of how it weighed the factors and applied them to the sentencing range. State v. Fuentes, 217 N.J. 57, 73 (2014). "To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence." Case, 220 N.J. at 65 (citing Fuentes, 217 N.J. at 74; R. 3:21-4(g)). "[I]f the trial court fails to identify relevant aggravating and mitigating factors, or merely enumerates them, or forgoes a qualitative analysis, or provides little 'insight into the sentencing decision,' then the deferential standard will not apply." Ibid. (quoting State v. Kruse, 105 N.J. 354, 363 (1987)).

A-4850-17T4

Defendant also contends the trial court improperly found aggravating factors three and nine by considering his claim of innocence. "The need for public safety and deterrence increase proportionally with the degree of the offense." State v. Carey, 168 N.J. 413, 426 (2001) (citing State v. Megargel, 143 N.J. 484, 500 (1996)). While "a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision," State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985), a denial of involvement or lack of remorse can be considered in evaluating whether the defendant is likely to commit another offense, Carey, 168 N.J. at 426-27, and the need for deterrence, State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991). Although defendant professed sorrow for what happened, he maintains his innocence of sexual assault and lacks remorse for his crime.

While defendant has no prior criminal convictions, his record includes a domestic violence restraining order in 2003 and violation of a municipal ordinance in 2012. Further, the Static-99R instrument categorized defendant as posing an average risk for criminal sexual reoffense. Given these circumstances, we discern no abuse of discretion in applying aggravating factors three and nine.

Defendant argues the trial court erred by not applying mitigating factor seven. We disagree. Defendant does not dispute that a final restraining order

22

(FRO) was entered against him under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The sentencing court may consider that FRO, which is based on a predicate act enumerated in the Criminal Code. N.J.S.A. 2C:25-19(a). Defendant also violated a municipal ordinance two years before the sexual assault by urinating in public. Such conduct is not indicative of leading a law-abiding life for a substantial period of time before the present offense. See State v. Buckner, 437 N.J. Super. 8, 38 (App. Div. 2014), aff'd on other grounds, 223 N.J. 1 (2015) (finding that defendant's municipal convictions, arrests, and bench warrant during the preceding ten years was "behavior that requires a finding that he had not led a 'law-abiding life'").

Lastly, defendant contends we should remand for resentencing because the ten-year prison term is unreasonable. We disagree. The aggravating factors and lack of mitigating factors were supported by the record, as was the finding that the aggravating factors substantially outweighed the non-existent mitigating factors. Where the aggravating factors preponderate, the term should be at the high end of the sentencing range. Fuentes, 217 N.J. at 73. We discern no basis to disturb the sentence; it is not manifestly excessive, unduly punitive, or so clearly unreasonable that it shocks the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4850-17T4